IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JENNIFER LOCKLEAR,               )
                                 )
            Plaintiff,           )
                                 )
    v.                           )          1:05CV00255
                                 )
PERSON COUNTY BOARD OF EDUCATION, )
and RONNIE BUGNAR, individually and in )
his official capacity as Superintendent of )
Person County Schools,           )
                                 )
            Defendants.          )
_____ )

MEMORANDUM OPINION

Tilley, Chief Judge

     This case arises out of a dispute between Plaintiff, Dr. Jennifer Locklear, and

Defendants, Ronnie Bugnar and the Person County Board of Education, over a

series of events leading to Dr. Locklear's resignation from her position as Principal

of Stories Creek Elementary School in June of 2004.  It is now before the Court on

the Defendants' Motion to Dismiss [Doc. # 6] and Motion for Judgment on the

Pleadings [Doc. # 9].  For the reasons set forth below, Defendants' Motion to

Dismiss is GRANTED in part and DENIED in part and Defendants' Motion for

Judgment on the Pleadings is DENIED.

I.

     The facts as alleged in the Complaint and stated in the light most favorable

to the Plaintiff are as follows: Dr. Locklear, a Native American, was the Principal of

Stories Creek Elementary School ("Stories Creek") from June of 2001 until her resignation in June of 2004. Dr. Locklear has a doctoral degree in Educational Leadership and has been working in the field of education since 1989. Stories Creek is located in Person County, North Carolina and is home to a program designed for students from other elementary schools in Person County (the "Stories Creek program"). These students travel to Stories Creek to participate in the four specialized classes that make up the Stories Creek program. Defendant Person County Board of Education (the "School Board") has supervisory authority over all matters relating to the public schools in Person County, North Carolina and has the power to hire and fire school personnel. Defendant, Ronnie Bugnar, is the Superintendent of Person County Public Schools. As Superintendent, Mr. Bugnar is responsible for supervising employees in administrative positions, including principals, and for making recommendations to the School Board regarding the employment of persons in administrative positions.

In May of 2003, Dr. Locklear was given an oral offer for a four year contract extension for her position as Principal of Stories Creek.[1] However, during the week following the verbal offer to extend Dr. Locklear's employment contract, the School Board chose to change its policy regarding the allocation of the state end-of-year test scores. The School Board decided to allocate the test scores for the

---

[1] It is not clear from the Complaint whether Mr. Bugnar or the Person County Board of Education made the oral offer of a four year contract to Dr. Locklear. (See Compl. ¶ 11.)

2

students who participated in the Stories Creek program to Stories Creek. Previously, these test scores had been allocated to the students' home schools. The new policy had the net effect of lowering the overall test scores for Stories Creek.

Dr. Locklear expressed her concerns over this decision to Mr. Bugnar in a private meeting. She explained to him that the allocation of the test scores of students who participated in the Stories Creek program to Stories Creek would have the effect of lowering the overall test scores for the school. She also told him that she was concerned this would reflect unfavorably on the students, teachers and other school personnel at Stories Creek. Dr. Locklear then informed her staff about the new policy and discussed with them the same drawbacks that she had discussed with Mr. Bugnar. She also told her staff that "it was the decision of the superintendent and would therefore stand." (Compl. ¶ 13.)

Approximately a week after the four year contract had been offered, the offer was rescinded in favor of a two year contract. At a closed meeting of the School Board, Mr. Bugnar explained to the members of the Board that Dr. Locklear had only received a two year contract because (1) she shared information with her staff inappropriately and (2) Dr. Locklear was "domineering," a personality trait which Mr. Bugnar attributed to the fact that Dr. Locklear is a Native American woman. (Compl. ¶ 15.) One member of the School Board, Ms. Pecolia Beatty,

3

told Mr. Bugnar that she found his remarks offensive. Mr. Bugnar responded with a written letter of apology to Ms. Beatty. In this letter, he included research that he had requested be conducted by a school psychologist for Person County. Mr. Bugnar asserted that this research supported his conclusion that "Indian culture is matriarchal in nature" and thus explained Dr. Locklear's actions and personality traits. (Compl. ¶ 17.)

On June 3, 2004, Mr. Bugnar questioned Dr. Locklear about an allegation that an answer sheet had been changed for a student at Stories Creek during the end-of-year tests. Dr. Locklear told Mr. Bugnar that she did not know who was responsible for this incident. In response, Mr. Bugnar told Dr. Locklear that he had heard other things from teachers at Stories Creek Elementary that gravely concerned him. However, when asked, he refused to provide Dr. Locklear with any more information about these concerns. Mr. Bugnar then told Dr. Locklear that "there would be an investigation and she had two options. . . . She could either be suspended with pay until the investigation was over, which he made clear would be a matter of public record, or she could voluntarily resign." (Compl. ¶ 18.) Dr. Locklear then asked Mr. Bugnar what was required for her to resign. He immediately produced a prepared resignation letter which Dr. Locklear signed.

On June 16, 2004, Dr. Locklear filed a charge of discrimination with the Equal Opportunity Commission and on December 23, 2004, the EEOC issued a right to sue letter. Dr. Locklear filed the present case on March 21, 2005, making

4

the following claims against the Defendants Mr. Bugnar and the Person County Board of Education: (1) sex discrimination and race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq.; (2) deprivations of the Plaintiff's constitutional rights under the First and Fourteenth Amendments in violation of 42 U.S.C. § 1983; and (3) state law claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence. Dr. Locklear seeks both compensatory and punitive damages.

On May 17, 2005, the Defendants moved to dismiss several of the Plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure [Doc. # 6]. The Defendants have also filed an Answer in this case [Doc. # 8] and a Motion for Judgment on the Pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure [Doc. # 9].[2]

II.

Both a motion to dismiss for failure to state a claim upon which relief can be granted and a motion for judgment on the pleadings are designed to test the legal sufficiency of the complaint. Eastern Shore Mkts, Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000); Davenport v. Robert H. Davenport, D.D.S., M.S., P.A., 146 F. Supp. 2d 770, 773 (M.D.N.C. 2001). When considering a

---

[2] The Plaintiff filed a Response in Opposition to the Defendants' Motion to Dismiss on June 9, 2005 [Doc. # 12] and the Defendants filed their Reply on June 23, 2005 [Doc. # 14]. The Plaintiff also filed a Response in Opposition to the Defendants' Motion for Judgment on the Pleadings on June 9, 2005 [Doc. # 11] and the Defendants filed their Reply on June 23, 2005 [Doc. # 13].

motion to dismiss under Rule 12(b)(6), a court must assume that the factual allegations in the complaint are true and construe them in the light most favorable to the nonmoving party. <u>Eastern Shore Mkts., Inc.</u>, 213 F.3d at 180. If a complaint fails to sufficiently state facts to support each element of the claims asserted therein, dismissal for failure to state a claim is proper. <u>Iodice v. United States</u>, 289 F.3d 270, 281 (4th Cir. 2002). Similarly, on a motion for judgment on the pleadings pursuant to Rule 12(c), dismissal is only appropriate if, taking the nonmoving party's allegations as true, "it is clear that the non-moving party can prove no facts sufficient to support his claim for relief." <u>Davenport</u>, 146 F. Supp. 2d at 773 (citing <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984)). Essentially, the standard applied to a motion made pursuant to Rule 12(c) is the same as that applied to a motion to dismiss under Rule 12(b)(6). <u>Barbier v. Durham County Bd. of Educ.</u>, 225 F. Supp. 2d 617, 630 (M.D.N.C. 2002).

The Defendants have moved to dismiss the Plaintiff's claims for the following reasons: (1) Plaintiff cannot establish a prima facie case of Title VII race discrimination; (2) Plaintiff cannot maintain a Title VII action against Defendant Bugnar in his individual capacity; (3) Plaintiff cannot maintain a cause of action under 42 U.S.C. § 1983; (4) Plaintiff has not pled all the necessary elements for her claims under state law; (5) the claims against Defendant Bugnar in his official capacity should be made against the Person County Board of Education; and (6) Plaintiff cannot recover punitive damages. Additionally, in their Motion for

6

Judgment on the Pleadings, the Defendants contend that (1) all of Dr. Locklear's claims are barred by a release of liability provision included in her June 3, 2004 resignation letter and (2) Dr. Locklear's claim of sex discrimination under Title VII should be dismissed because Dr. Locklear failed to exhaust her administrative remedies as to this claim.[3]

### III.

In their Motion for Judgment on the Pleadings, the Defendants contend that Dr. Locklear's claims are barred by a release of liability clause contained in the resignation letter she signed on June 3, 2004. In the Release, Dr. Locklear agrees to "relinquish any and all claims, past or present, confirmed or contingent, arising out of my employment with the Person County Board of Education . . . ." (Answer, Ex. A.) According to the Defendants, this release provision is a "comprehensively phrased general release of all claims arising out of [Dr. Locklear's] employment with the Defendant School Board" and thus "constitutes a bar to Plaintiff's claims against the Defendants." (Def.'s Mem. Supp. Mot. J. Pldgs. 4.)

Under North Carolina law, release provisions are contractual in nature and are "governed by the same rules of execution, validity, and interpretation as those governing contracts." Horton v. Norfolk S. Corp., 102 F. Supp. 2d 330, 339

---

[3] A copy of Dr. Locklear's resignation letter dated June 3, 2004 is attached as Exhibit A to the Defendants' Answer [Doc. # 8]. A copy of Dr. Locklear's "Charge of Discrimination" filed with the EEOC is attached as Exhibit B.

(M.D.N.C. 1999) (citing <u>Travis v. Knob Creek, Inc.</u>, 353 S.E.2d 229, 230 (N.C. Ct. App. 1987), <u>rev'd on other grounds</u>, 362 S.E.2d 277 (N.C. 1987)).  For a valid contract to exist under North Carolina law, three elements must be present: offer, acceptance, and consideration.  <u>Copy Prods., Inc. v. Randolph</u>, 303 S.E.2d 87, 88 (N.C. Ct. App. 1983).  Moreover, the offer, acceptance, and consideration should not be infected by fraud, duress, or unconscionability.  <u>Id.</u>

At this stage of the case, the release provision in Dr. Locklear's resignation letter of June 3, 2004 cannot be found to bar any of her claims against the Defendants.  Neither party has pointed to any evidence tending to show that Dr. Locklear received any consideration for releasing her claims against the Defendant School Board.  Therefore, the Defendants' Motion for Judgment on the Pleadings will be denied.

IV.

A.

The Defendants have moved to dismiss Dr. Locklear's claim of race discrimination under Title VII on the grounds that she has failed to allege facts sufficient to establish a prima facie case.  To establish a prima facie case of discrimination under Title VII, Dr. Locklear must show: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) at the time of the adverse employment action, she was performing at a level that met her employer's legitimate job expectations; and (4) the position was filled by a similarly

8

qualified applicant outside the protected class. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973); <u>King v. Rumsfeld</u>, 328 F.3d 145, 149 (4th Cir. 2003); <u>Dugan v. Albemarle County Sch. Bd.</u>, 293 F.3d 716, 720-21 (4th Cir. 2002).

The Defendants contend that Dr. Locklear cannot establish a prima facie case of race discrimination because none of the events alleged in the Complaint constitute an adverse employment action. (Def.'s Mem. Supp. Mot. Dismiss 4.) In the Complaint, Dr. Locklear refers to two incidents she contends constitute adverse employment actions: (1) the rescission of the offer for a four year contract extension in favor of an offer for a two year extension and (2) the June 3, 2004 meeting between Mr. Bugnar and Dr. Locklear at which Dr. Bugnar informed her that she could either resign or face an investigation accompanied by a suspension with pay.

The Fourth Circuit has defined "adverse employment actions" as those that affect the terms, conditions, or benefits of employment. <u>Munday v. Waste Mgmt. of N. Am., Inc.</u>, 126 F.3d 239, 243 (4th Cir. 1997), <u>cert. denied</u>, 522 U.S. 1116 (1998). The term "adverse employment action" encompasses both ultimate employment decisions, such as a hiring, discharge, demotion or refusal to promote, as well as acts of retaliation or harassment so long as the challenged action adversely affects the terms, conditions, or benefits of the plaintiff's employment. <u>See</u> <u>Von Gunten v. Md.</u>, 243 F.3d 858, 866 (4th Cir. 2001) ("Adverse employment action includes any retaliatory act or harassment if, but only if, that

9

act or harassment results in an adverse effect on the terms, conditions, or benefits of employment.") (citation omitted).

A reduction in the length of an employee's contract extension has been held to constitute an adverse employment action in some limited circumstances. See Turner v. Sullivan Univ. Sys., Inc., 2006 WL 626401 (W.D. Ky. Mar. 8, 2006); Swaim v. Westchester Acad., 208 F. Supp. 2d 579 (M.D.N.C. 2002). In both of these cases, however, there were other factors present that adversely affected the terms, conditions, or benefits of the plaintiff's employment. For example, in Turner, the district court held that the offer of a six-month contract and a one percent raise rather than the customary year long contract and a four percent raise constituted an adverse employment action. 2006 WL 626401, at *10. In so holding, the court noted that, for approximately four years, the defendant had offered the plaintiff a year long contract and a four percent raise every year. Id. Similarly, in Swaim, the district court found that the offer of a ten-month renewal contract at a reduced salary instead of the customary twelve-month contract that the plaintiff had been offered every year for thirty-four years constituted an adverse employment action. 208 F. Supp. 2d at 585-86. The plaintiff in Swaim was also the only employee who customarily received a twelve-month contract to be offered a reduced contract. Id. at 583.

Both Turner and Swaim are distinguishable from the present case. In both cases, the reduced contract offer was accompanied by a reduction in salary or

10

percentage raise.  However, in the present case, it does not appear that the two year contract offer included any reduction in Dr. Locklear's salary, benefits, rank or level of responsibility.  Indeed, Dr. Locklear has not alleged that the terms of her contract were reduced in any fashion other than the length of the proposed contract extension.  Cf. James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 376 (4th Cir. 2004) (noting that a job reassignment can only be considered an adverse employment action when plaintiff suffers a "significant detriment" such as decreased compensation, rank, responsibilities, or opportunity for promotion).

Furthermore, in both Turner and Swaim, there was evidence that the plaintiffs, over an extended period of time (four years in Turner and thirty-four years in Swain), had received a year long contract extension every year.  Dr. Locklear, on the other hand, became Principal of Stories Creek in June of 2001. (Compl. ¶ 2.)  She received an oral offer for a four year contract extension in May of 2003 (id. ¶ 11) and one week later, this offer was rescinded in favor of a two year extension (id. ¶ 14).  Thus, with the exception of the week-long period following the oral offer of a four year contract, Dr. Locklear had no reason to form any particular expectation about the length of the contract extension she might receive.  Cf. Turner, 2006 WL 626401, at *10 ("Although [Defendant] certainly has discretion in the contracts it gives its instructors, its practice since 1998 had been to give [Plaintiff] a year-long contract and a raise of approximately four percent.  To suddenly change these terms to six months and one percent is

11

certainly materially less favorable than the terms to which [Plaintiff] was accustomed and expected to receive.").

Indeed, the only detriment identified by Dr. Locklear with regards to the second contract offer is that it somehow represents "less job security." (Pl.'s Resp. 7.) However, she has not cited any authority for the proposition that "less job security" constitutes an adverse employment action. Moreover, it is also important to note that Dr. Locklear was in fact offered (and appears to have accepted) a two year employment contract. Thus, Dr. Locklear has failed to show that the rescission of an offer for a four year contract in favor of one for two years constitutes an adverse employment action in this case as it did not effect the terms, conditions, or benefits of her employment.

The second adverse employment action alleged by Dr. Locklear concerns her June 3, 2004 meeting with Mr. Bugnar. According to Dr. Locklear, Mr. Bugnar told her that (1) there would be an investigation into the allegations regarding the doctored answer sheet and "other things" that he had heard from teachers at Stories Creek and (2) she would be suspended with pay until the investigation was over. (Compl. ¶ 18.) In Thompson v. Potomac Elec. Co., the Fourth Circuit found that the placement of an employee on decision-making leave after he left his post without authorization did not constitute an adverse employment action. 312 F.3d 645, 648, 651-52 (4th Cir. 2002). The court reasoned that because the employee lost no pay and maintained the same position in the wake of this disciplinary

action, it did not affect the terms, conditions or benefits of his employment.  Id. at 651-52.  In the present case, Dr. Locklear resigned instead of being placed on a suspension with pay.  However, she has not alleged that she would have lost pay or job rank as a result of the suspension with pay.  Therefore, the Court cannot find that the suspension with pay affected the terms, conditions, or benefits of her employment.

Moreover, the Fourth Circuit has held that the enforcement of a generally applicable discipline policy is not an adverse employment action because "terms, conditions, or benefits of a person's employment do not typically, if ever, include immunity from the application of basic employment policies or exemption from a state agency's disciplinary procedures."  Von Gunten, 243 F.3d at 869 (citing McKenzie v. Ill. Dep't of Transp., 92 F.3d 473, 484 (7th Cir. 1996) (no adverse employment action where employer enforces a generally applicable policy against an employee)).  In this case, the North Carolina Teacher Tenure Act provides that:

> If a superintendent believes that cause may exist for dismissing or demoting a career employee for any reasons specified in G.S. 115C-325(e)(1), but that additional investigation of the facts is necessary and circumstances are such that the career employee should be removed immediately from his duties, the superintendent may suspend the career employee with pay for a reasonable period of time, not to exceed 90 days.  The superintendent shall notify the board of education within two days of his action and shall notify the career employee within two days of the action and the reasons for it.  If the superintendent has not initiated dismissal or demotion proceedings against the career employee within the 90-day period, the career employee shall be reinstated to his duties immediately and all records of the suspension with pay shall be removed from the career

13

employee's personnel file at his request. . . .

N.C. Gen. Stat. § 115C-325(f1).  Thus, Mr. Bugnar's reference to a suspension

with pay during an investigation was consistent with the disciplinary procedures

provided for by statute.  As such, a suspension with pay during an investigation

into a complaint about a doctored answer sheet cannot constitute an adverse

employment action.  See Von Gunten, 243 F.3d at 869 (finding no adverse

employment action when employer placed plaintiff on administrative leave with pay

while investigating a complaint that had been made against her).

Dr. Locklear, however, contends she was "coerced [into resigning] by a

threat to make public an investigation of allegations of misconduct" and thus was

constructively discharged.  (Pl.'s Resp. Opp. 8.)  Constructive discharge occurs

when an employer creates intolerable working conditions in a deliberate effort to

force the employee to resign.  Goldsmith v. Mayor & City Council of Baltimore,

987 F.2d 1064, 1072 (4th Cir. 1993) (citation omitted).  Therefore, when making

a claim of constructive discharge, a plaintiff must allege two elements: (1) the

employer's actions were deliberate and (2) the plaintiff was subjected to intolerable

working conditions.  Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir.

1985).  Even assuming Dr. Locklear has alleged facts sufficient to support a finding

of deliberateness, she has failed to allege that she was subjected to intolerable

working conditions prior to her resignation.

A court assesses whether working conditions are intolerable "by the

14

objective standard of whether a reasonable person in the employee's position would have felt compelled to resign." Goldsmith, 987 F.2d at 1072 (citation omitted). "The doctrine of constructive discharge protects an employee from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers." Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994) (citation omitted). "Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Id. (citation omitted).

Dr. Locklear contends that Mr. Bugnar's reference to the fact that the investigation "would be a matter of public record" was in effect a threat of "public humiliation." (Pl.'s Resp. 9.) She also asserts that when Mr. Bugnar mentioned that he had heard other complaints about her, he was "attempting to make the case against the plaintiff seem large and far-reaching in an attempt to frighten her into resigning." (Id.) However, Dr. Locklear's subjective interpretation of Mr. Bugnar's comments is not sufficient to establish that Dr. Locklear was subjected to intolerable working conditions. See Young v. Shore Health Sys., 305 F. Supp. 2d 551, 560 n.1 (D. Md. 2003) ("The law does not permit an employee's subjective perceptions to govern the claim of constructive discharge.") (citation omitted). The investigation and suspension with pay proposed by Mr. Bugnar are not unreasonably harsh conditions in excess of those faced by Dr. Locklear's

15

coworkers.  Indeed, they are a component of the disciplinary procedures that all

employees of the School Board are subject to under North Carolina law.  Thus,

these conditions are not so intolerable that a reasonable person in Dr. Locklear's

position would have felt compelled to resign.

B.

Dr. Locklear's claim of sex discrimination under Title VII will also be

dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[4]  As

discussed above, Dr. Locklear has not alleged facts sufficient to support a prima

facie case of race discrimination under Title VII.  Specifically, the facts set forth in

the Complaint, taken as true, do not support a finding that Dr. Locklear suffered an

adverse employment action.  Therefore, she has also failed to establish the required

elements for a prima facie case of sex discrimination under Title VII.  See Hill v.

Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004)

(elements of prima facie case of sex discrimination include: (1) plaintiff is a

member of a protected class; (2) plaintiff suffered an adverse employment action;

(3) plaintiff was performing her job duties at a level that met her employer's

legitimate expectations; and (4) the position remained open or was filled by

---

[4] In their Motion for Judgment on the Pleadings, the Defendants contend
that Dr. Locklear's claim of sex discrimination under Title VII should be dismissed
because Dr. Locklear failed to include this claim on the "Charge of Discrimination"
form that she filed with the EEOC.  (Answer, Ex. B.)  However, the Court need not
address this issue as Dr. Locklear has failed to allege facts sufficient to state a
prima facie case of sex discrimination under Title VII.

16

similarly qualified applicants outside the protected class).  Accordingly, this claim also fails as a matter of law.

V.

Dr. Locklear also claims that the Defendants have deprived her of her rights under the First and Fourteenth Amendments to the U.S. Constitution in violation of 42 U.S.C. § 1983.  (Compl. ¶¶ 31, 44-48.)  The Defendants have moved to dismiss both of these claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

A.

In the Complaint, Dr. Locklear lists a cause of action under 42 U.S.C. § 1983 for a violation of her Fourteenth Amendment rights: "Defendant, by its acts, has violated the Plaintiff's constitutional rights to equal protection and due process of law under the Fourteenth Amendment."  (Compl. ¶ 31.)  This cause of action incorporates the same factual allegations that Dr. Locklear relies on to support her claims of race and sex discrimination under Title VII.  (See Compl. ¶ 30.)  It therefore appears that Dr. Locklear is claiming that her Fourteenth Amendment rights to equal protection and due process were violated because she was discriminated against on the basis of her race and sex.[5]

---

[5] The Defendants also contend that Dr. Locklear has failed to comply with Federal Rule of Civil Procedure 8(a)(2) in making this claim under § 1983 for a violation of her Fourteenth Amendment rights.  Rule 8(a)(2) provides that a viable complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This requirement is "designed

17

In Great Am. Savs. & Loan v. Novotny, the Supreme Court held that 42 U.S.C. § 1985(3) could not be used to assert violations of Title VII. 442 U.S. 366, 372-78 (1979); see also Hughes v. Bedsole, 48 F.3d 1376, 1383 n.6 (4th Cir. 1995) (noting that § 1985(3) is the "conspiracy counterpart to § 1983"). In so holding, the Court noted that Title VII provides for an extensive remedial scheme that requires plaintiffs to submit to "a detailed administrative and judicial process designed to provide an opportunity for nonjudicial and nonadversary resolution of claims." Id. at 372-73. The Court reasoned that if plaintiffs were able to bring suit under § 1985(3) for violations of Title VII, they could effectively circumvent this remedial scheme. Id. at 375-76.

Relying on Novotny, the Fourth Circuit has held that a plaintiff "cannot bring a cause of action under § 1983 for a violation of her Fourteenth Amendment rights" when the plaintiff "originally could have instituted a Title VII cause of action." Hughes, 48 F.3d at 1383 n.6 (citing Novotny, 442 U.S. at 372-78); see also Schaeffer v. County of Chatham, 337 F. Supp. 2d 709, 721 (M.D.N.C. 2004) (dismissing plaintiff's § 1983 claim for a violation of Title VII). In this case, Dr. Locklear seeks to assert claims under § 1983 for violations of Title VII, that is, race

---

to ensure that the complaint will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Slade v. Hampton Rds. Reg'l Jail, 407 F.3d 243, 252 (4th Cir. 2005) (citing Conley v. Gibson, 355 U.S. 41, 47 (1957)). Indeed, there is some merit to the Defendants' contention that the Complaint does not provide them with "fair notice" of the nature of this claim and the grounds upon which it rests. However, the Court need not reach this issue as other grounds exist for dismissing this claim.

and sex discrimination.  However, because these claims are subject to the remedial

scheme set forth in Title VII, Dr. Locklear is precluded from bringing them under §

1983.  See Causey v. Balog, 929 F. Supp. 900, 913 (D. Md. 1996) ("Novotny's

holding . . . is a broad statement of the importance of requiring plaintiffs seeking to

vindicate rights created by Title VII to operate within the statute's remedial

scheme.").   Accordingly, Dr. Locklear's claim under § 1983 for a violation of her

rights under the Fourteenth Amendment will be dismissed.

B.

Dr. Locklear has also made a claim under § 1983 for First Amendment

retaliation.  Specifically, she contends that the Defendants retaliated against her for

exercising her rights under the First Amendment when she voiced her concerns

over the new test score allocation policy.

It is well-settled that the "government may not retaliate against a public

employee who exercises her First Amendment right to speak out on a matter of

public concern."  Love-Lane v. Martin, 355 F.3d 766, 776 (4th Cir. 2004) (citing

Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, 391 U.S. 563, 573 (1968)).

To state a claim for First Amendment retaliation, a plaintiff must allege that (1) the

speech at issue relates to a matter of public concern; (2) the employee's interest in

First Amendment expression must outweigh the employer's interest in the efficient

operation of the workplace; (3) the employee was retaliated against in some

fashion, that she was deprived of a valuable benefit or adversely affected in a

19

manner that would tend to chill her exercise of First Amendment rights; and (4) the protected expression was a substantial factor in the decision to take the alleged retaliatory action. Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 351-52 (4th Cir. 2000). The Defendants contend that the Plaintiff has not alleged facts sufficient to satisfy any of these elements.

Speech involves a matter of public concern if it affects the social, political, or general well-being of a community. Connick v. Myers, 461 U.S. 138, 146 (1983). "Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment, but are matters more immediately concerned with the self-interest of the speaker as employee." Stroman v. Colleton County Sch. Dist., 981 F.2d 152, 156 (4th Cir. 1992) (citing Connick, 461 U.S. at 147). Therefore, when determining if speech involves a matter of public concern, a court must consider "whether the public or the community is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a private matter between employer and employee." Edwards v. City of Goldsboro, 178 F.3d 231, 247 (4th Cir. 1999) (citation omitted). In performing this inquiry, a court examines the "content, context, and form" of the employee's speech in light of the entire record. Id. (citing Connick, 461 U.S. at 147-48).

According to the Complaint, Dr. Locklear discussed the School Board's

20

decision to change the manner in which the end-of-year test scores were allocated on two occasions. She "expressed to Mr. Bugnar in a private meeting reasons why the decision would result in lower scores at her school which may not be justified and could reflect unfavorably on the school personnel and students." (Compl. ¶ 13.) She also "informed her staff of the policy and discussed with them the drawbacks she had discussed with Mr. Bugnar." (Id.)

The content of Dr. Locklear's speech is of obvious concern to the teachers, students and parents of Stories Creek. Test scores are intended to serve as a measure of the quality of education received by the students of the school. Thus, any discussion of their accuracy or fairness may reasonably be considered a matter of public concern. See, e.g., Bernheim v. Litt, 79 F.3d 318, 325 (2d Cir. 1996) (holding that plaintiff's speech involved a matter of public concern when she spoke out against publication of false test scores because speech concerned quality of education which is a matter of serious interest to community); Ibarra v. Houston Indep. Sch. Dist., 84 F. Supp. 2d 825, 836 (S.D. Tex. 1999) (noting that test scores are "legitimately of general public interest"). Moreover, the fact that Dr. Locklear voiced her concerns over the new test score policy in a private meeting with Mr. Bugnar and in meetings with her staff does not render this speech any less a matter of public concern. See Garcetti v. Ceballos, 126 S.Ct. 1951, 1959 (May 30, 2006) ("That [plaintiff] expressed his views inside his office, rather than publicly is not dispositive."); see also Love-Lane, 355 F.3d at 777 ("The fact that

21

[Plaintiff] at times voiced her complaints about discriminatory discipline in faculty meetings and in private meetings with [Defendants] does not forestall a conclusion that her speech involved a matter of public concern."); Goldstein, 218 F.3d at 354 ("[P]ublic employees do not forfeit the protection of the Constitution's Free Speech Clause merely because they decide to express their views privately rather than publicly.") (citation omitted).

The Defendants contend that Dr. Locklear's discussion of the change in the School Board's test score allocation policy did not involve a matter of public concern, but rather Dr. Locklear's own personal economic interest. According to the Defendants, scores from the end-of-year tests are used to determine whether school personnel are eligible for certain financial rewards from the North Carolina State Board of Education. (Def.'s Mem. Supp. Mot. Dismiss 8.) However, on a motion to dismiss, the Court must view the facts in the light most favorable to Dr. Locklear. See Goldstein, 218 F.3d at 354 (noting that at the summary judgment stage court must view evidence that speech involved matter of public concern in the light most favorable to the non-moving party). In this light, the Court cannot conclude that as a matter of law Dr. Locklear's speech did not involve a matter of public concern.[6]

_____

[6] On May 31, 2006, the Defendants filed a Suggestion of Subsequently Decided Authority pursuant to Local Rule 7.3(i), citing Garcetti v. Ceballos, 126 S.Ct. 1951 (May 30, 2006) [Doc. # 15]. In Garcetti, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the

Having found that Dr. Locklear has alleged facts sufficient to support a finding that her speech involved a matter of public concern, the next question is "whether the degree of public interest in the employee's statement was outweighed by the employer's responsibility to manage its internal affairs and provide effective and efficient service to the public." Goldstein, 218 F.3d at 354 (citation omitted). The Defendants argue that Dr. Locklear's expression damaged Mr. Bugnar's "working relationship with other school employees" and undermined his authority as Superintendent. (Def.'s Mem. Supp. Mot. Dismiss 9-10.) However, the facts alleged in the Complaint do not support a finding that Dr. Locklear's comments so interfered with Mr. Bugnar's authority as Superintendent that they damaged his working relationship with school employees.[7] Nor is there sufficient evidence at this stage to support a conclusion that the School Board's interest in an efficient workplace outweighs the public's interest in Dr. Locklear's

_____

Constitution does not insulate their communications from employer discipline." Id. at 1960. However, central to the Court's holding was the fact that the plaintiff's statements were made pursuant to his official duties. Id. at 1959-60 ("The controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calender deputy. That consideration . . . distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline."). In the present case, the record is not sufficiently developed at this stage of the case to determine whether Dr. Locklear's speech was made pursuant to her official duties.

[7] Indeed, the Complaint specifically alleges that after Dr. Locklear informed her staff of the new test score allocation policy, she "told the staff that it was the decision of the superintendent and would, therefore, stand." (Compl. ¶ 13.) Thus, the Court cannot find, at this stage of the case, that Dr. Locklear undermined Mr. Bugnar's authority as Superintendent.

23

expression.

The next question is whether the retaliatory acts alleged by the plaintiff deprived her of some "valuable government benefit or adversely affected [her] in a manner that, at the very least, would tend to chill [her] exercise of First Amendment rights." Goldstein, 218 F.3d at 356. Although discharge from employment is clearly sufficient under this test, the action need not be the substantial equivalent of a discharge to violate a public employee's rights under the First Amendment. DiMeglio v. Hanes, 45 F.3d 790, 806 (4th Cir. 1995) (citing Rutan v. Republican Party of Ill., 497 U.S. 62, 75-76 (1990)). Indeed, "something less onerous than an adverse employment action in the context of Title VII may so chill the exercise of constitutional rights as to constitute a showing of adversity in a First Amendment retaliation case under § 1983." Saleh v. Upadhyay, 11 Fed. Appx. 241, 255 (4th Cir. May 21, 2001) (unpublished per curiam opinion) (citing Power v. Summers, 226 F.3d 815 (7th Cir. 2000)).

In her Complaint, Dr. Locklear alleges that "[a]pproximately one week after the four year contract had been offered, the offer was rescinded in favor of a two year contract." (Compl. ¶ 14.) Certainly, the knowledge that she could lose an offer for a four year contract in favor of a contract for a shorter term could serve to deter Dr. Locklear from speaking out again about the test score allocation policy or some other matter of public interest. See Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005) ("[F]or the purposes of a

24

First Amendment retaliation claim under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter "a person of ordinary firmness" from the exercise of First Amendment rights."). Moreover, the loss of two years from a four year job contract offer represents more than a *de minimus* inconvenience. Cf. ACLU of Md. v. Wicomico County, Md., 999 F.2d 780, 786 (4th Cir. 1993) (finding that loss of private meeting space with prison inmates was a *de minimus* inconvenience for plaintiffs and thus did not chill or impair their exercise of First Amendment rights). Although the loss of two contract years may not constitute an adverse employment action under Title VII, it could be considered a "valuable benefit" for the purposes of a First Amendment retaliation claim.[8] See Saleh, 11 Fed. Appx. at 255.

Finally, in order to satisfy the final element of a claim for First Amendment retaliation, that of causation, Dr. Locklear must allege facts sufficient to support a finding that her protected speech was a "substantial factor" in the decision to reduce the length of her employment contract. See Wagner v. Wheeler, 13 F.3d 86, 90 (4th Cir. 1993) ("The initial burden lies with the plaintiff, who must show that his protected expression was a substantial or motivating factor in the employer's decision to terminate him. If the plaintiff successfully makes that showing the defendant may still avoid liability if he can show . . . the protected

---

[8] Dr. Locklear has not alleged that her resignation at the meeting with Mr. Bugnar in June of 2004 was a result of her protected speech about the test score allocation policy.

25

speech was not the but for cause of the termination.") (citing <u>Mt. Healthy City</u>

<u>Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977)).  In this case, Dr.

Locklear has alleged that within a week of her discussing the test score allocation

policy with her staff, Mr. Bugnar explained to the School Board that "the plaintiff

had only received a two-year contract because she shared information with her

staff inappropriately."  (Compl. ¶ 15.)  For purposes of a motion to dismiss, this

allegation is sufficient to support a finding that Dr. Locklear's protected speech

was a substantial factor in the decision to reduce the length of her employment

contract.  Therefore, Dr. Locklear has successfully stated a claim under § 1983 for

First Amendment retaliation.

VI.

Having found that Dr. Locklear has successfully alleged a claim for First

Amendment retaliation in violation of 42 U.S.C. § 1983, the next question is

whether the Defendants can be held liable for a violation of Dr. Locklear's First

Amendment rights.

A.

In order to hold a municipality liable for a constitutional violation under §

1983, a plaintiff must show that it was an official policy or custom of the

municipality that caused the violation.[9]  <u>Love-Lane</u>, 355 F.3d at 782 (citation

---

[9] A public school board is considered a municipality in North Carolina.
<u>Barbier</u>, 225 F. Supp. 2d at 630 (citing <u>Sides v. Cabarrus Mem'l Hosp., Inc.</u>, 205
S.E.2d 784, 786-87 (N.C. Ct. App. 1974)).

26

omitted).  This "official policy" requirement is "intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."  Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986) (emphasis in original).  A municipality may be held liable for a single decision so long as that decision is an act of "official policy."  Id. at 480-81 ("[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.").  The term "official policy" not only refers to "formal rules and understandings" followed over a lengthy period of time but also to "a course of action tailored to a particular situation."  Id. at 481 ("If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood.").  However, in order "to hold a municipality liable for a single decision (or violation), the decisionmaker must possess final authority to establish municipal policy with respect to the action ordered."  Love-Lane, 355 F.3d at 783 (citing Pembaur, 475 U.S. at 480).

The Defendants contend that Dr. Locklear's claim § 1983 against the Defendant School Board should be dismissed because "plaintiff has not identified any potential bases (other than a respondeat superior theory) for imposing liability on the Board."  (Def.'s Mem. Supp. Dismiss 12.)  However, Dr. Locklear has

27

alleged that the School Board "has the power to control and supervise matters pertaining to the public schools in Person County, North Carolina and has the power and authority to hire and terminate personnel." (Compl. ¶ 3.) Thus, according to the Complaint, the School Board has "final authority" with regards to the hiring and firing of school personnel. Moreover, Dr. Locklear has also alleged that the School Board was involved in the decision to reduce the term of her contract extension.[10] Thus, taking the facts in the light most favorable to the nonmoving party, it appears that the reduction in the length of Dr. Locklear's contract extension was a decision over which the School Board exercised final authority. Therefore, Dr. Locklear's claim under § 1983 for First Amendment retaliation will be allowed to proceed against the Defendant School Board.

B.

Dr. Locklear has brought suit against Mr. Bugnar in both his individual capacity and his official capacity as Superintendent of Person County Schools. However, any claim made against Mr. Bugnar in his official capacity is essentially a claim against the School Board. See Ky. v. Graham, 473 U.S. 159, 165 (1985) ("Official capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent."). Therefore, because

---

[10] Specifically, Dr. Locklear alleges that "[a]t a closed meeting of the Board, [Mr. Bugnar] explained, in answer to a question posed by the Board, that the plaintiff had only received a two-year contract because she shared information with her staff inappropriately and was "domineering," which he attributed to the fact that the plaintiff is a Native American woman." (Compl. ¶ 15.)

official capacity suits are essentially suits against the entity itself, they may be dismissed where the government entity has also been sued. See id. at 166 (noting that official capacity suits are "to be treated as a suit against the entity" and "not a suit against the official personally"); Love-Lane, 355 F.3d at 783 (affirming district court's decision to dismiss claim against individual official in his official capacity where government entity had also been sued); Schaeffer, 337 F. Supp. 2d at 721 (dismissing claims against individual official in her official capacity as "essentially duplicative" of plaintiff's claims against the municipality). Accordingly, Dr. Locklear's § 1983 claim against Mr. Bugnar in his official capacity will be dismissed.

C.

The Defendants also assert that Mr. Bugnar is protected from individual liability on Dr. Locklear's First Amendment claim by the doctrine of qualified immunity. Government officials are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity "protects law enforcement officers from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines.'" Wilson v. Collins, 141 F.3d 111, 114 (4th Cir. 1998) (citation omitted). The Fourth Circuit has noted that "the purpose of qualified immunity is to remove most civil liability actions, except those where

29

the official clearly broke the law, from the legal process well in advance of the submission of facts to a jury." Slattery v. Rizzo, 939 F.2d 213, 216 (4th Cir. 1991).

To determine whether an official is entitled to qualified immunity, a district court must (1) identify the right allegedly violated, (2) consider whether at the time of the alleged violation the right was clearly established, and (3) determine whether a reasonable person in the official's position would have known that his or her actions would violate that right. Love-Lane, 355 F.3d at 783 (citation omitted). Having found that the facts in the light most favorable to Dr. Locklear demonstrate that Mr. Bugnar's conduct violated her First Amendment right to free speech, see supra Part VB, the next question is whether this right was clearly established in May of 2003, when the events at issue took place. However, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001). Thus, "[w]hen considering whether the plaintiff has asserted a violation [of] a clearly established right, the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." DiMeglio, 45 F.3d at 803 (citation omitted).

Dr. Locklear's speech concerned the Defendants' decision to change the manner in which test scores were allocated among schools in Person County.

30

Therefore, the question in this case is whether it was clearly established in May of 2003 that the test score allocation policy involved a matter of public concern.  See Robinson v. Balog, 160 F.3d 183, 187 (4th Cir. 1998) (noting that the threshold question in determining whether an employee's speech is entitled to constitutional protection is whether the speech "may be fairly characterized as constituting speech on a matter of public concern") (citing Rankin v. McPherson, 483 U.S. 378, 384 (1987)).  On one hand, test scores are an indicator of the quality of education in Person County, an issue which is clearly a matter of public concern.  See, e.g., Bernheim, 79 F.3d at 325; Ibarra, 84 F. Supp. 2d at 836.  However, the manner in which test scores are allocated among the different schools in Person County may have little to do with the quality of education provided by those schools. Moreover, in the Complaint, Dr. Locklear alleges that she "expressed to Mr. Bugnar in a private meeting reasons why the decision would result in lower scores at her school which may not be justified and could reflect unfavorably on the school personnel and students."  (Compl. ¶ 13.)  Thus, Dr. Locklear may have discussed the test score allocation policy with Mr. Bugnar and her staff because she was concerned the policy would negatively affect the reputation of Stories Creek and, by extension, her reputation as Principal of Stories Creek.  See Connick, 461 U.S. at 147 ("[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in

31

which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.").

Moreover, a reasonable person in Mr. Bugnar's position would not have known that a reduction in the length of Dr. Locklear's contract term violated her First Amendment right to speak about the test score allocation policy. Dr. Locklear discussed the new test score allocation policy during (1) a private meeting with Mr. Bugnar and (2) a meeting with her staff. See Connick, 461 U.S. at 147-48 (noting that the content, form, and context of the speech in question determines whether it involves a matter of public concern or merely concerns a matter of "personal interest" to the employee). None of her statements were made in the sort of public forum that would alert a reasonable person to the fact that Dr. Locklear was speaking as a citizen on a matter of public concern rather than as employee on a matter of personal interest. C.f. Robinson, 160 F.3d at 188-89 (finding that because plaintiffs spoke at public hearing and in connection with law enforcement investigation, it was evident from the form and context of plaintiffs's speech that they did not speak "in their capacity as public employees but as citizens upon matters of public concern" and thus government officials were not entitled to qualified immunity) (citations omitted).

While there may be a component of Dr. Locklear's speech that touches on a matter of public concern, it is equally possible that her speech concerned a matter of personal interest to Dr. Locklear: her performance as Principal of Stories Creek

32

as reflected by the school's test scores.  See Williams v. Hatton, 1997 WL

314721, at * 2 (4th Cir. June 12, 1997) (unpublished per curiam opinion) ("[E]ven

if [the plaintiff's] speech might have touched on a legitimate public concern, the

import of that fact is not so clear that we can deny public employees qualified

immunity.").  Therefore, it was not clearly established in May of 2003 that Dr.

Locklear's discussion of the test score allocation policy involved a matter of public

concern: it would not have "be[en] clear to a reasonable officer [in Mr. Bugnar's

position] that his conduct was unlawful [in violating Dr. Locklear's First

Amendment rights] in the situation he confronted."  Saucier, 533 U.S. at 202.

Accordingly, Mr. Bugnar is entitled to qualified immunity.

VII.

Dr. Locklear also seeks punitive damages for her § 1983 claims.  However,

"in the absence of statutory provisions to the contrary, municipal corporations are

immune from punitive damages."  Long v. City of Charlotte, 293 S.E.2d 101, 115

(N.C. 1982).  The Supreme Court has held that punitive damages are not

recoverable against a municipality in a suit brought under § 1983.  City of Newport

v. Fact Concerts, Inc., 453 U.S. 247, 267 (1981) (noting that "an award of

punitive damages against a municipality punishes only the taxpayers, who took no

part in the commission of the tort").  As noted earlier, a "public school board is

considered a municipality in North Carolina."  Barbier, 225 F. Supp. 2d at 630

(citing Sides v. Cabarrus Mem'l Hosp., Inc., 205 S.E.2d 784, 786-87 (N.C. Ct.

App. 1974)).  Therefore, because punitive damages are not available against a municipality, Dr. Locklear's claim for punitive damages under § 1983 will be dismissed.

## VIII.

Finally, Dr. Locklear has made a number of claims under state law for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence.  The Defendants have also moved to dismiss these state law claims for failure to state a claim upon which relief can be granted.[11]

## A.

In order to state a claim for intentional infliction of emotional distress, a plaintiff must allege that (1) defendants engaged in extreme and outrageous conduct; (2) the conduct was intended to cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress.  Waddle v. Sparks, 414 S.E.2d 22 (N.C. 1992).  Whether the alleged conduct is sufficiently extreme and outrageous to support a claim of intentional infliction of emotional distress is a question of law for the trial judge.  Lenins v. K-Mart Corp., 391 S.E.2d 843, 848

---

[11] Although Dr. Locklear has set forth these claims in her Complaint, she has failed to respond to this portion of the Defendants' Motion to Dismiss in her Response brief.  Therefore, the Defendants' Motion to Dismiss will be treated as unopposed pursuant to Local Rule 7.3(k) as to these claims.  Although unopposed motions "will ordinarily be granted without further notice," L.R. 7.3(k), the court must verify that dismissal is appropriate under the circumstances.  See Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993) (holding that where a motion for summary judgment is unopposed, the district court must nonetheless ensure that the moving party is entitled to judgment as a matter of law).

(N.C. Ct. App. 1990).  In order to be "extreme and outrageous," the alleged conduct must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  Hogan v. Forsyth Country Club Co., 340 S.E.2d 116, 123 (N.C. Ct. App. 1986) (quoting Restatement (Second) of Torts, § 46 cmt. (d) (1965)).

North Carolina courts have been reluctant to find intentional infliction of emotional distress claims actionable in the context of employment lawsuits.  See Groves v. Travelers Ins. Co., 535 S.E.2d 105, 107-09 (N.C. Ct. App. 2000) (McGee, J., dissenting), rev'd per curiam on reasoning of dissent, 552 S.E.2d 141 (N.C. 2001); Haburjak v. Prudential-Bache Sec., Inc., 759 F. Supp. 293, 302-03 (W.D.N.C. 1991) (collecting cases).  Thus, "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to support a claim of intentional infliction of emotional distress."  Thomas v. N. Telecom, Inc., 157 F. Supp. 2d 627, 635 (M.D.N.C. 2000) (finding alleged conduct not extreme and outrageous where employer gave plaintiff excessive workload compared to coworkers, filed paperwork late causing her to lose disability benefits, and discharged her in retaliation for exercising her rights under Title VII).

In this case, Dr. Locklear alleges that (1) Mr. Bugnar called her "domineering" and ascribed this characteristic to the fact that she is a Native American woman; (2) the Defendants rescinded an offer for a four year contract

35

extension in favor of a two year extension; (3) Mr. Bugnar confronted her about

allegations of a doctored answer sheet; (4) Mr. Bugnar referred to other problems

with her school that "gravely concerned him" but would not tell her what these

problems were; and (4) Mr. Bugnar threatened her with a "public" investigation

into these allegations, thus forcing her to resign.  Assuming these allegations are

true, they do not rise to the level of "extreme and outrageous" conduct required for

a successful claim of intentional infliction of emotional distress.  See Brown v.

Burlington Indus., Inc., 378 S.E.2d 232, 232 (N.C. Ct. App. 1989) (finding alleged

conduct extreme and outrageous when employee's supervisor made sexually

explicit remarks and gestures two to three times a week over extended period of

time); Hogan, 340 S.E.2d at 116 (finding alleged conduct extreme and outrageous

when supervisor engaged in repeated unwanted sexual touching of plaintiff,

screamed profanities at her when she refused his advances, threatened her with

bodily injury and pulled a knife on her); Dickens v. Puryear, 276 S.E.2d 325, 332

(N.C. 1981) (finding alleged conduct extreme and outrageous when defendants

pointed pistol between plaintiff's eyes, beat him into semi-consciousness with

nightsticks, and threatened him with castration); compare Atkins v. USF Dugan,

Inc., 106 F. Supp. 2d 799, 810-11 (M.D.N.C. 1999) (finding conduct not extreme

and outrageous when employee told he was "too old and too sick" to handle his

job and terminated in violation of federal and state discrimination laws); Pardasani

v. Rack Room Shoes, Inc., 912 F. Supp. 187, 192 (M.D.N.C. 1996) (finding

36

conduct not extreme and outrageous when plaintiff alleged he was given poor performance evaluations, denied promotions available to others, excluded from training, and finally terminated from his employment); Lorbacher v. Housing Auth. of City of Raleigh, 493 S.E.2d 74, 81-82 (N.C. Ct. App. 1997) (finding alleged discharge in retaliation for exercise of First Amendment rights not extreme and outrageous conduct); Hogan, 340 S.E.2d at 122-23 (finding conduct not extreme and outrageous when co-employee screamed and shouted at plaintiff, called her names, and threw menus at her). Thus, as a matter of law, Dr. Locklear has failed to allege sufficiently extreme and outrageous conduct by the Defendants to state a claim for intentional infliction of emotional distress. The Defendants' motion to dismiss this claim will therefore be granted.

B.

In order to state a claim for negligent infliction of emotional distress, a plaintiff must allege that (1) the defendants negligently engaged in conduct; (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress; and (3) the conduct did in fact cause the plaintiff severe emotional distress. Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 395 S.E.2d 85, 97 (N.C. 1990). Moreover, "[i]n order to establish actionable negligence, a plaintiff must show that: (1) defendant failed to exercise due care in the performance of some legal duty owed to plaintiff under the circumstances; and (2) the negligent breach of such duty was the proximate cause of the injury."

37

<u>Guthrie v. Conroy</u>, 567 S.E.2d 403, 410-11 (N.C. Ct. App. 2002) (citation omitted).  A legal duty is an obligation recognized by law requiring a person to conform to a certain standard of conduct for the protection of others against unreasonable risks.  <u>Id.</u> at 411 (citation omitted).

Both Dr. Locklear's claims of negligent infliction of emotional distress and negligence must fail because she has failed to allege any acts of negligence on the part of the Defendants.  The Complaint contains a single conclusory allegation that the Defendants were negligent: "The above acts of discrimination were negligently perpetrated against the Plaintiff by the Defendant, Bugnar, which Defendant could reasonably foresee and did in fact proximately result in Plaintiff suffering several mental and emotional distress."  (Compl. ¶ 37.)  However, the material factual allegations of the Complaint charge nothing but intentional conduct on the part of the Defendants.  "When the plaintiff's complaint alleges acts of discrimination that are intentional in nature, and simply concludes that the acts were committed negligently, it is insufficient to state a claim for negligent infliction of emotional distress."  <u>Barbier</u>, 225 F. Supp. 2d at 631 (citing <u>Mitchell v. Lydall, Inc.</u>, 1994 WL 38703, at *3-4 (4th Cir. Feb. 10, 1994) (unpublished opinion)); <u>see also</u> <u>Thomas</u>, 157 F. Supp. 2d at 637 (dismissing claim for negligent infliction of emotional distress because plaintiff had only alleged discriminatory conduct, which is "inherently intentional" conduct); <u>Shaeffer</u>, 337 F. Supp. 2d at 734 (dismissing plaintiff's claim of negligent infliction of emotional distress because plaintiff had

38

only alleged intentional conduct on the part of the defendants).  Dr. Locklear has therefore failed to state a claim for either negligent infliction of emotional distress or negligence and both of these claims will be dismissed.

IX.

For the foregoing reasons, Defendants Motion to Dismiss [Doc. # 6] is GRANTED in part and DENIED in part and Defendants' Motion for Judgment on the Pleadings [Doc. # 9] is DENIED.  The sole remaining claim in this case is Dr. Locklear's claim under 42 U.S.C. § 1983 for First Amendment retaliation against Defendant Person County Board of Education.

This the day of June 22, 2006

     /s/ N. Carlton Tilley, Jr.
United States District Judge